IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

## DEMARICEO CHALMERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 10-01339     Glenn I. Wright, Judge**

_____

**No. W2015-02235-CCA-R3-PC  -  Filed November 7, 2016**

_____

A Shelby County jury convicted the Petitioner, Demarico Chalmers, of attempted aggravated robbery and first-degree felony murder, and the trial court sentenced the Petitioner to an effective sentence of life plus five years.  This Court affirmed the Petitioner's convictions.  *State v. Demarico Chalmers*, No. W2011-01274-CCA-R3-CD, 2012 WL 3601626, at *1 (Tenn. Crim. App., at Jackson, Aug. 22, 2012), *Tenn. R. App. P. 11 app. denied* (Tenn. Jan. 9, 2013).  The Petitioner filed a petition for post-conviction relief in which he alleged that that his trial counsel was ineffective by failing to obtain gunshot residue testing.  After a hearing, the post-conviction court denied the Petitioner's petition.  On appeal, the Petitioner contends that the post-conviction court erred.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, Demarico Chalmers.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Charles Summers, III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A.  Trial**

This case arises from the killing of the victim, Tina Nelson, on October 11, 2009. For his role in this killing, a Shelby County grand jury indicted the Petitioner for

attempted aggravated robbery and first-degree felony murder. In our opinion from the Petitioner's first direct appeal, we summarized the facts presented at trial as follows:

> On October 11, 2009, Tina Nelson, the victim, was driving home from her sister's house in Frayser, Tennessee. The victim stopped at a red light at the intersection of North Watkins and Burnham Street and was accosted by two men. One of the men, later determined to be [the Petitioner], shattered the driver's side window of the victim's car with his hand and the butt of a gun. The victim screamed and struck [the Petitioner] with a bottle. [The Petitioner] then fatally shot and killed the victim. Within minutes of the offense, [the Petitioner] and one of his co-defendants were apprehended. [The Petitioner] provided a statement to authorities admitting to attempting to rob the victim; however, [the Petitioner] claimed that he did not intend to kill the victim. [The Petitioner] was indicted for felony murder and attempted aggravated robbery. The following proof was adduced at his trial:

Our Court went on to summarize all of the evidence presented at trial, which we will summarize for brevity's sake. The victim's sister testified that October 11, 2009, was the last time she saw her sister alive when her sister left her house at 8 p.m.

Law enforcement officers testified about responding to this crime scene. Officer Onrico Atkins of the Memphis Police Department responded to a shooting call within a few seconds of the call and could not initially locate a victim. He found her, unresponsive, lying in a car near the storefront. He called an ambulance. A witness to the shooting who was at the scene saw "two [male blacks] approach the vehicle . . . [in] all dark clothing. One was armed with a gun, and they went running east from the intersection." The witness said the men were of "slim build, maybe six feet tall." When Officer Atkins left the scene, he saw two African-American men, one of whom was the Petitioner, standing in front of a red SUV. The officer approached turned on his lights, ordered the men to the ground, and saw a gun in the center console of the SUV.

Sergeant James K. Smith examined three crime scenes and collected evidence, the first where the shooting occurred, the second where the victim's car came to a stop, and the third where the suspects were apprehended. From the primary scene, Sergeant Smith collected a spent .45 caliber shell casing, a piece of glass, and another separate piece of glass from the middle of the intersection, all of which were entered into evidence at trial. Sergeant Smith also photographed the victim's car, with both doors open and the hood up, auto glass from the middle of the intersection at Watkins and Burnham, the victim's property including her wallet, purse, cash, cell phone, and driver's license, and the interior of the victim's car, focusing on the driver's seat and console area. The

2

photograph of the interior of the victim's car depicted the back portion of the driver's seat and the seat belt with possible blood on it. It also showed glass in the front seat. Sergeant Smith also discussed a photograph of what he described as a "bullet strike" on the passenger side door of the victim's car. Sergeant Smith collected a fluid sample of blood from the driver's side door of the victim's car, placed it in an envelope, and identified the envelope at trial. Sergeant Smith also processed the third crime scene, finding several pieces of relevant evidence.

Dr. Marco Ross, a forensic pathologist and medical examiner with the Shelby County Medical Examiner's Office, testified regarding the victim's autopsy report, which was performed on October 12, 2009 at 9:15 a.m. The report showed that the victim suffered a gunshot entry wound to her upper chest just below her neck with the bullet exiting her right shoulder. The victim also had a gunshot graze wound at the tip of her left index finger, likely from the same bullet that entered her chest. The victim died as a result of the gunshot wound to her chest.

Witnesses to the shooting testified. Mr. Larry Churchill was near the intersection of North Watkins and Burnham on the night of the offense and saw the victim's car was "four lanes of traffic across the street." After purchasing an item at the gas station, he entered his truck and began to exit the driveway of the store. He noticed "some guys standing on the corner . . . all dressed in black, and they were kind of fidgety." Mr. Churchill had to cross four lanes of traffic to return home. He said that he was beside the victim's car but traveling in the opposite direction. She was stopped at a red light. He saw two black men run up to the door of the victim's car. As Mr. Churchill's car became even with the victim's car, he saw one of the men "pull[ ] a gun out" and immediately fire it.

Mr. Churchill said the men left the victim's car and ran "right in front of him." He followed the men, and observed that they ran across the street behind a library. He continued to follow them to a street that dead-ended into Burnham while his girlfriend called the police. Within minutes, he returned to the location of the victim's car, which had rolled to a building, and the police had arrived. After advising the police of what he had observed, police showed Mr. Churchill a photographic display, and he identified the Petitioner as the individual he saw shoot inside the victim's car. Mr. Churchill also identified the Petitioner at trial.

Ms. Coats, another witness to the shooting, testified consistently with the testimony of Mr. Churchill. In addition, Coats said that as they turned to pass a burgundy car, which was sitting at a red light, she heard three gunshots. She watched the burgundy car as it went through the intersection and hit a wall. She said she was focused on the car because she thought there might be children in it. She said the car was at the red light, sat

there for a couple of seconds, and then slowly rolled through the red light over the curb. She was unable to identify any of the perpetrators involved in the offense.

Demar Wells, a crime scene officer, obtained the Petitioner's blood for a DNA sample. He also transported three gunshot residue kits which had been collected from Joseph Hill, the Petitioner, and the victim. Officer Stacy Milligan processed the victim's car. He collected what appeared to be blood samples from the steering wheel, the handle of the door, and the frame of the car door. He collected four DNA samples from the interior of the car, specifically from the steering wheel, the driver's seat, the driver's side interior, and the driver's side exterior. Officer Milligan also collected the bullet slug from the door panel of the victim's car. Officer Alpha Hinds identified evidence relating to the red SUV by which officers found the Petitioner after the shooting. He identified pictures of the gun, bullets, and the magazine recovered from the SUV. He also identified glass shards, a black jacket, skull caps, and blood-stained tennis shoes found in the SUV.

Memphis Police Sergeant James Max, the case investigator, obtained the Petitioner's statement and also DNA samples from the Petitioner and the Petitioner's cousin, which he forwarded to the Tennessee Bureau of Investigation ("TBI"), along with other evidence. Within hours of the offense, the Petitioner, who had been advised of his *Miranda* rights, provided a statement to Sergeant Max, admitting to attempting to rob the victim. The Petitioner provided a five-page typewritten statement, which read, in pertinent part, as follows:

[Question]: Are you the person responsible for the death of [the victim]
[Answer]: I guess so.
[Question]: Did you know [the victim]?
[Answer]: No Sir.
[Question]: Were you armed with a weapon and if so can you describe it?
[Answer]: Yes sir, an all black .45 automatic
[Question]: Did anyone else participate with you in this incident and if so name them?
[Answer]: Yes sir, Joseph, I don't know the other two dudes names I just met them today, and Carderro[.]
      . . . .
[Question]: Was anyone else armed with a weapon?
[Answer]: I think the short dude had a gun, but I never saw it.
[Question]: In detail explain the events prior to, during, and after the incident. Do you understand?
[Answer]: Yes sir. We met up it was me, Joseph, and my cousin Caderro, and we met up with the other two dudes. They started talking about what

4

we was doing and they said they were looking for somebody to rob too. All of us started walking down Watkins from the street by Piggly Wiggly, and the lady pulled up at the red light in a burgundy car like a Ford Taurus. The little dude said let's get that car right there, and all three of us said alright and ran towards the car. Caderro said I ain't down with this and ran the opposite way of us because when I tu[r]ned around it was just me, Joseph, and the short dude. Me, the little short dude, and Joseph, the short dude was on my left side, Joseph was on my right side ran up to the car I busted the driver's window with the gun in my right hand. The lady she just started hollering, and I can remember she swung like a beer bottle if I'm not mistaken with her right hand because it went all over me. Then the tip of the bottle hit me in the face and the beer came out all over me. I jumped back and at the same time she was swinging all of us jumped back and she grabbed the gun at the same time. Then the gun went off. We ran. I didn't know if I shot her. When the gun went off we ran across the back of the car and we ran to my cousin Starkishi's house.
[Question]: What did you say to the lady after you broke the window out of her car?
[Answer]: I didn't really say nothing. I didn't get a chance.
    . . . .
[Question]: Did you mean to shoot the lady in the car?
[Answer]: No sir.

The Petitioner's initials were placed at the bottom of each page, and he signed the last page of the statement. The Petitioner identified a photograph of Joseph Hill, one of the other perpetrators who was also charged in the offense. On cross-examination, Sergeant Max confirmed that he retrieved the gunshot residue kit performed on the victim's hands from the Medical Examiner's Office.

Special Agent Lawrence James, an expert in forensic biology and serology employed with the TBI, analyzed the evidence forwarded from Sergeant Max. Agent Lawrence said the following items tested positive for blood and were a full match with the Petitioner's DNA: (1) the swab recovered from the exterior driver's door of the victim's car; (2) the swab from the exterior port of the gun recovered from the SUV; (3) the substance on the inside of the tennis shoe recovered from the SUV; (4) the red t-shirt recovered from the SUV; and (5) the jacket recovered from the SUV. The skull cap recovered from the back of the SUV tested positive for blood; however, Agent Lawrence was only able to extract a partial DNA profile that was consistent with Chalmers. There was no indication of anyone other than the victim's DNA on the victim's nail clippings or other items collected during the autopsy.

Special Agent Cervinia Braswell, an expert in firearms identification employed with the TBI, examined the gun, four .45 auto cartridges, and the .45 auto magazine recovered from the SUV. She testified that the gun was functioning properly with two safety features, a lever safety and a magazine safety, meaning that a person would have to actually pull the trigger, exerting seven pounds of pressure on it, in order for the gun to discharge. Agent Braswell said the bullet slug recovered from the victim's car was fired through the gun recovered from the SUV.

The Petitioner testified on his own behalf. The Petitioner admitted that the gun recovered from the SUV belonged to him and that the red SUV belonged to Mr. Hill's mother. He said he was high on marijuana before the shooting, and he heard one of the men he was with say, "Let's get that car right there." Although the Petitioner thought all of the group was running to the car, there were only two other men who actually participated in the robbery. The Petitioner said he intended to use his gun to rob the people in the car. He was standing on the driver's side of the victim's car, but her window was rolled up. He "threw the gun into the window[,]" and the window broke. Although the top half of the window broke off, the Petitioner insisted that, at this point, he did not cut his finger because his hand "hardly touched the window." He said the robbery did not go as planned because the victim began hollering and threw her hand across the gun. He said, "[the victim] hollered and threw my arm to the side of the window and swung a beer bottle and hit me in my face." At this point, the Petitioner said he did not want to go through with the robbery. The Petitioner claimed that he and the victim both had their hands on the gun. When the victim threw the gun "to the side with a yank," she pulled the Petitioner back at the same time, and the gun went off. The Petitioner said the gun discharged once. After the gunshot, the Petitioner thought, at most, the victim was shot in the hand. After the shooting, the Petitioner noted his hand was cut, and he used his red shirt to stop the bleeding. He said the police apprehended him fifteen minutes after this shooting and that he fully cooperated.

Based upon this evidence, the jury convicted the Petitioner of attempted aggravated robbery and first-degree felony murder. The Petitioner appealed, and we affirmed the sufficiency of the evidence supporting his convictions. *Chalmers*, 2012 WL 3601626, at *3.

## B. Post-Conviction

In January 2014, the Petitioner filed a petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel because his counsel had not obtained the gunshot residue test performed upon the victim. He asserted that his theory of defense was that the gunshot went off during a struggle and that the gunshot residue test results would have aided his defense. The trial court held a hearing, during

6

which the parties presented the following evidence: The Petitioner testified that during the trial he learned that officers never turned the gunshot residue test taken of the victim's hands into the TBI for testing. He said that his defense was based upon the fact that the victim was shot during a struggle over the gun. The Petitioner acknowledged that he was convicted of felony murder but said that the struggle over the weapon was still relevant because he attempted to abandon the crime. He believed that testing would have provided potentially exculpatory evidence.

During cross-examination, the Petitioner testified that he met with his trial counsel on "many" occasions. The two discussed his theory of defense. He was aware of the overwhelming evidence against him. The Petitioner agreed that he engaged in a robbery of the victim. He possessed a firearm at the time, he broke her car window with the weapon, and began to engage in a robbery. He said, however, that when the victim was uncooperative he tried to "back away" from the robbery. He attempted to "snatch" the weapon from the window, but the victim had already grabbed the gun. The Petitioner said he was unsure what a gunshot residue test consisted of or what the findings would have shown. The Petitioner agreed that the State's medical expert testified at his trial that the injury to the victim's hand was consistent with her trying to grab the gun. The Petitioner maintained that test results from a gunshot residue test showing that the victim had gunshot residue on her hands would have proven that he tried to abandon the crime.

The Petitioner's trial counsel ("Counsel") testified and described the Petitioner as "a very nice client." He said that the Petitioner had provided a statement to police that he participated in an attempted robbery of the victim. He said that the Petitioner told him that, shortly before the victim was shot, the Petitioner wanted to stop the act of robbery. The Petitioner further stated that he did not intend to shoot the victim. Counsel agreed that there was overwhelming evidence against the Petitioner but that they were hoping for jury nullification. Counsel said that this was a decision that he and the Petitioner discussed and came to together. Counsel said he discussed with the Petitioner that any time a gun is fired it creates a cloud of residue. Anyone in the vicinity could have gunshot residue on them, so it was likely that the victim would have had gunshot residue on her hands whether or not there was a struggle for the gun. He said that any test results would not have advanced their theory of defense.

During cross-examination, Counsel agreed that, if the testing showed that there was gunshot residue on the victim's hands, it would have helped to a "certain degree" because it would have shown that the gun was not straight up at the victim. He further stated, though, that as a defense lawyer it was easier to argue about the State's failure to test evidence than to deal with a test result that contradicted the theory of defense. Counsel stated that, had the gunshot residue test of the victim's hand showed that she had no gunshot residue on her hands, it would have undercut their theory of defense.

On redirect examination, Counsel testified that his not pursuing the gunshot residue test was a tactical decision.

The post-conviction court issued a written order denying the petition for post-conviction relief. In it, the post-conviction court found:

> Defense counsel was not ineffective for failing to have the [gunshot] residue samples that were taken from the victim's hands tested by the Tennessee Bureau of Investigation. The standard for evaluating the effectiveness of counsel as it relates to post-conviction relief requires the Petitioner to show both that defense counsel acted in an unreasonable manner, which caused prejudice to the Petitioner sufficient to affect the outcome of the case. Here, the actions of defense counsel were not unreasonable given the theory of the case. The decision [ ] not to have [ ] the [gunshot] residue samples tested would not have affected the outcome of the case. It is clear from the record that defense counsel was aware of the untested [gunshot] residue samples and that after consideration decided that the samples were at best not helpful to the case and at wors[t] detrimental to the defense of the Petitioner. It is not the job of the Court to second-guess reasonable tactical decisions made in the development of the Petitioner's defense. The test, if positive, will only corroborate the State's position that the shot was fired at close range, inside the vehicle of the victim. The [gunshot] residue in no way speaks to the mental state of the Petitioner at the time of the incident, which was the primary issue of consequence in the case. In summary, the [gunshot] residue was not relevant to the theory of the case argued by the defense at trial, the decision not to solicit test results that could undermine the defense was reasonable, and any conclusions that could have been draw from the test are not sufficient to alter the outcome of the case.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that his trial counsel was ineffective for failing to have the gunshot residue test conducted by the TBI. He states that the test results would have "revealed a pattern" that showed that he was stepping away from the victim when the gun was fired. The State counters that the Petitioner offered no proof at the post-conviction hearing to establish the results of such testing. Further, the State

8

contends, the test results would not have aided his defense because they would merely show that the Petitioner shot the victim at close range.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999*); Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House*

*v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We conclude that the post-conviction court did not err when it found that the Petitioner had not proven facts by clear and convincing evidence that show that he had received the ineffective assistance of counsel. Counsel testified that his decision not to pursue testing was tactical, positing that arguing lack of testing was easier than dealing with potentially negative test results. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *See House*, 44 S.W.3d at 515. The Petitioner has further failed to show Counsel's decision hurt his defense. He did not present any test results at the post-conviction hearing, and as

10

such he cannot prove that Counsel's tactical decision prejudiced him.  *See Black v. State*, 794 S.W.2d 752 (Tenn. 1990).  The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the post-conviction court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE